### JACK v. WILLIAMS et al.

### STATE ex rel. CUNNINGHAM et al. v. JACK et al.

(Circuit Court, D. South Carolina. February 1, 1902.)

1. JURISDICTION OF FEDERAL COURTS—CITIZENSHIP OF PARTIES—ACTIONS EX RELATIONE.

A suit in the name of a state, on relation, is to be treated, for the purpose of determining the jurisdiction of a federal court, as though the relators were alone the complainants.

2. RAILROADS—DUTY TO OPERATE—NATURE AND EXTENT.

In the absence of special circumstances, or an express contract embodied in a charter, the owner of a railroad, whether a corporation or individual, cannot be compelled to maintain and operate the same at an actual loss. The duty arising from the ownership of the franchise is merely to meet the public requirements, and, where the traffic on a road is not sufficient to pay its operating expenses, such duty does not require its operation, and it may be abandoned.

**8. SAME—POWER OF COURT TO ORDER DESTRUCTION OF ROAD AND SALE OF MATERIALS.**

A railroad company built a short piece of road, wholly with the proceeds of bonds sold, and then became insolvent. In a suit to foreclose the mortgage securing the bonds a receiver was appointed, who by leave of court issued certificates, with the proceeds of which he completed the road to a length of 12 miles, by which it connected two towns. He operated the road for a number of years in the most economical manner, and without salary himself, but its earnings barely paid operating expenses, producing nothing for creditors, or even for maintenance and repairs. After several attempts to sell the road, at which no bids were received, it was purchased for $15,000 by three holders of receiver's certificates, and the sale confirmed. At that time private persons could own and operate a railroad under the laws of the state, but by a law passed soon thereafter all natural persons owning a railroad were required to organize into a corporation within 60 days, in default of which the franchise of the road was declared forfeited. The purchasers of this road failed to incorporate, and after its franchise had thus been forfeited one of them brought a suit to obtain a sale of the property and a division of the proceeds. A receiver was appointed, and the road was inspected by an expert, who reported that $10,000 must be expended in repairs to render the road safe to operate for one year. There was no statute of the state making it obligatory upon the owner of a railroad to operate the same, nor was there any such requirement in the charter of the original company, which was permissive only, and the road had not been operated since its sale. *Held*, that to compel the owners to repair and operate the road at a certain loss, or to keep it intact, though unused, would be to deprive them of their property without compensation, and that the court was justified, under the circumstances, in ordering the receiver to dismantle the road and sell the materials.

**4. SAME.**

The receiver having taken up and sold the rails under an order of court entered without opposition, the court could not require the owners to purchase new materials and rebuild the road, on an offer by interveners to lease and operate the same if restored, especially in view of the fact that the franchise to operate it as a railroad had been forfeited.

In Equity. On cross bill of interveners.
See 102 Fed. 210, 106 Fed. 259.

Ansel & Cothran, for complainant.

B. A. Hagood, for defendants.

J. W. Barnwell, B. M. Shuman, and J. H. Heyward, for cross complainants.

Ansel & Cothran, B. A. Hagood, S. J. Simpson, and J. R. Lamar, for cross defendants.

SIMONTON, Circuit Judge. This case now comes up on the cross bill filed by the state of South Carolina, ex relatione T. B. Cunningham, and others, the answers thereto, and the testimony taken before the special master upon the issues therein set forth. Although the name of the state is used, still the suit being ex relatione, this court has jurisdiction. Maryland v. Baldwin, 112 U. S. 490, 5 Sup. Ct. 278, 28 L. Ed. 822; Indiana v. Glover, 155 U. S. 517, 15 Sup. Ct. 186, 39 L. Ed. 243.

The legislature of South Carolina, in December, 1882, granted a charter to the Greenville & Port Royal Railroad Company, permitting it to construct a railroad from Greenville, S. C., to the port of Port

Royal, in the same state. It had the power to issue bonds and secure the same by the mortgage of its property and franchises, and natural persons and municipal corporations, as well as other corporations, were authorized to subscribe to its capital stock. In December, 1885, its charter was amended by the general assembly of South Carolina. Its name was changed into that of the Atlantic, Greenville & Western Railway Company, and its route was so changed as to extend from Greenville to Ninety-Six, in said state, with the privilege of extending eastward from Ninety-Six to some point on the Atlantic Coast, and westward from Greenville to the North Carolina line, by such route as the directors should select. By this act power was given to townships along the line of the road, or interested in its construction, to subscribe to the stock of said road, and to this end any such townships were declared to be bodies corporate. This special provision has been declared invalid. Floyd v. Perrin, 30 S. C. 1, 8 S. E. 14, 2 L. R. A. 242. By an act passed in December, 1886, the Piedmont and Pelzer Manufacturing Companies were each authorized to subscribe to the capital stock of this road. It may be mentioned in passing that there is no evidence in the record showing that any municipal or private corporation or person subscribed or paid any cash or property toward the capital of this company. In 1887, under the provisions of the general railroad act of South Carolina, this Atlantic, Greenville & Western Railway Company was consolidated with a corporation existing under the laws of the state of North Carolina and of the state of Tennessee, and thus became known as the Carolina, Knoxville & Western Railway Company. Some parts of the roadbed of this projected railway were built, but no part of it was constructed, except some 12 miles, starting from Greenville, toward the town of Marietta, in said county. The story of this enterprise is one of disaster. The construction company which undertook the contract for building the road became insolvent, and was placed in the hands of a receiver. The railway company itself was also placed in the hands of a receiver, being utterly insolvent. Soon after his appointment the receiver of the railway company applied to the court for leave to issue certificates to be used in completing the road toward Marietta, a distance of three miles. At the time of this application the road had no other terminus except Greenville, the other terminus being in the woods, and it was hoped that should it be extended to Marietta its business would be improved and its profits increased, and perhaps means could be provided for extending the road into territory which would serve the purposes of the contemplated enterprise and induce prosperity. Leave was granted, and the town of Marietta was reached. So low, however, were the credit and prospects of the railway that but for the efforts of the receiver and his personal friends the certificates could not have been placed. The railway under the receivership was conducted with the greatest economy. Every unnecessary expense was cut off. The receiver himself received no salary, notwithstanding that he gave his personal attention to the management. As a result, however, whether owing to the poverty of the territory or to the indifference of the people, the part of the railway so constructed scarcely met its operating expenses. Finally, the

services of a superintendent could not be provided for, and the receiver had to fill the place himself. The roadbed of the other parts of the road and the railway on this small section had been constructed entirely from the proceeds of bonds secured by a mortgage of the whole road. Not a dollar of interest had been paid on any of these bonds, the amount of the total issue being $200,000. The right of way contracted for and secured had not been paid for. The road ran through a territory requiring many trestles, and these and the roadbed itself were fast decaying, requiring immediate repair, their condition endangering life and property. Under these circumstances, the creditors applied for a sale of the road. No organization could be effected for its purchase, and a sale was ordered on 17th August, 1892, at an upset price of $50,000. At the sale under this order no bids were received. Another sale was ordered 16th March, 1895, the upset price having been fixed at $30,000. No bids were made at this sale. Then the upset price of $25,000 was fixed at another sale ordered 23d September, 1895, and again no bids were made. Finally, on 24th June, 1896, a sale was ordered, and the highest bid, $15,000, was received and accepted. At this sale James T. Williams became the purchaser. At the date of this purchase the road, roadbed, and rolling stock of the railway were in such a dilapidated condition that the railway could not have been operated without putting on many and expensive repairs. Williams did not operate it at all. Thereupon proceedings were instituted before one of the state judges, by way of mandamus, to compel him to operate the road. These proceedings failed because of an irregularity in them, the rule for the mandamus having been issued by one judge, and the return heard and mandamus issued by another judge, who was without jurisdiction. At the date of the purchase of this road the law of South Carolina gave the privilege to any purchaser of a railroad sold under foreclosure, of or under a provision in a mortgage, to organize a corporation to own and operate the same. Rev. St. S. C. § 1610.

In 1897, March 5th, the legislature passed an act requiring any person then owning any line of railroad in this state to reorganize, under section 1610, within 60 days after the passage of that act, under a penalty of $50 per day for each day of failure to operate said road, unless reasonable cause be shown to the contrary, and, in addition to the penalty he should forfeit all the franchises, powers, and privileges granted to the railroad purchased. Williams did not accept the provisions of this act. Soon after the passage of the act, D. F. Jack filed his bill in this court, stating the purchase of this road by Williams; that the purchase was made by him for the benefit of himself, D. F. Jack, and H. C. Beattie; that he was not willing to organize a corporation under the requirements of the act of 1897; that it was impossible to rebuild the road, except at great expense, and with no prospect of gain; and praying an injunction against his co-tenants from making any effort in that direction; praying also for the appointment of a receiver to take charge of the property. Answers were filed, the injunction issued, and the receiver appointed. It is well to say here that this court in granting this order had no notice whatever of the mandamus proceeding in the state court. An inspection of the rail-

road property was had by a skillful railroad supervisor, under the instructions of the receiver, who reported that there were 22 trestles on the road, all of which but 2 needed extensive repairs; that 12,000 cross-ties were needed; that in many places the roadbed was covered with dirt two feet deep; and that it would cost over $10,000 to put the road in proper condition to run one year.

The case thus presented to the court was this: This section of the railway had been built with borrowed money; had been operated for several years; had not, even when it was new and without need of repairs, earned more than its operating expenses, paying nothing on its debt by way of interest or principal, and paying nothing to the receiver. Its business had not increased. Its road had run down, requiring large additional expenditure. Its right of way had not been paid for, and the claims on this head were a first lien. It paid nothing on its first cost. It could pay nothing on the increased outlay which was imperatively demanded. Any one, natural person or corporation, attempting to operate it, would meet certain loss. It could not be operated except by a corporation, and the purchasers had lost the privilege of incorporation, and the right to exercise the franchises, under the provisions of the act of 1897. Under these circumstances, the court authorized the sale of the rails on the road, and the taking them up. The sale was made, and the rails brought $28,000, the Charleston & Western Carolina Railway Company being the purchaser. After the order of sale the present relators filed their petition for leave to intervene, the prayer of which was granted, and leave was also given to review the previous action of the court in ordering the sale. They filed their answer to the original bill, and asked and obtained leave to file this cross bill. This has been answered. The main issue in the case is: Can the court authorize the taking up and the sale of the rails on this railroad, which has been under operation, thus practically authorizing its abandonment?

A railroad is in a sense a public concern. To its construction and operation the action of the sovereign is needed. If a corporation is created, the franchise to be a corporation can be given only by the sovereign. Its franchise as a common carrier for hire of passengers and freight comes from the sovereign. Its right to exercise the right of eminent domain can come only from the sovereign. And, as its road is in a sense a highway, the sovereign grants that also. The consideration for these acts of the sovereign is the utility of the enterprise to the public. To be thus useful to the public, the road must be kept up in such a condition that life and property both must be made as safe as practicable. The rates of transportation of persons and freight must be reasonable. And the reasonable number of trains must be kept up, dependent upon the circumstances surrounding the railway. Whilst thus serving the public, however, no corporation or private person is obliged to continue the service without a reasonable remuneration. No one can be compelled to serve the public for nothing. Private property of no kind, including railroad property, can be used for public purposes without compensation. Smyth v. Ames, 169 U. S. 467, 18 Sup. Ct. 418, 42 L. Ed. 819; Road Co. v. Sandford, 164 U. S. 578, 17 Sup. Ct. 198, 41 L. Ed. 560; Chicago, M. & St. P. R. Co.

v. Minnesota, 134 U. S. 418, 10 Sup. Ct. 462, 33 L. Ed. 970; Railway Co. v. Smith, 173 U. S. 684, 19 Sup. Ct. 565, 43 L. Ed. 858. All these cases determine that a railroad company, in the full enjoyment and use and capacity to use its franchises, cannot be compelled to exercise its franchises without reasonable remuneration. A fortiori a railroad corporation, or a person owning a railroad, cannot be compelled to operate that road, not only without remuneration, but at a loss. And this not by any means because such corporation or person is insolvent. If a citizen has the wealth of the Rothschilds, he cannot be compelled to use a dollar of his wealth for public purposes without compensation. What, then, is a person to do who becomes possessed of wholly unproductive railroad property?. Sell it? But in the case at bar several distinct efforts to sell had been made, and made in vain. No bid whatever had been made except by these purchasers. The public—even that portion of the public on the line of the road—could not be induced to make a bid on it. Repair it and put it in condition? But experience had shown that even when it was a new road, requiring no expense for repairs, it barely paid operating expenses. Could the state or the public, in the face of the fourteenth amendment, compel such an expenditure, involving certain loss? Evidence has been introduced of persons who are of the opinion that the road would pay. Can such testimony override the result of actual experience? It appears also in evidence that, notwithstanding the existence of this road, dealers in cotton and farmers preferred to carry their cotton to market in wagons, rather than to ship it by rail. The difference of cost must have been small. But, small as it was, the people about the road evidently estimate the general advantage of the road at a sum still smaller. Under these circumstances, what other course could have been pursued? The roadbed was in such a condition that it could not be operated. The expenses attending its repair held out no hope of remuneration. The purchasers had lost the privilege of incorporation and retention of the franchise. They owned the property. Was it to be kept idle and useless, or could they dismantle it?

This question is somewhat of novel impression,—at least, there is no decision exactly on all fours with it. The leading case on this subject is Kansas v. Dodge City, M. & T. R. Co. (Kan.) 36 Pac. 755, 24 L. R. A. 564, and this clearly resembles the case at bar. In that case a mandamus was refused. This is the headnote:

"Where a railroad company owning a short line of railroad, 26 miles only, is wholly insolvent, and such company has no cars or engines with which to operate it, and no funds or property to be applied to the payment of expenses of the company or the road, and the road has been abandoned for several months, and the road cannot be operated except at a great loss by any corporation or person, not taking into account the repairs of the road and the taxes thereon, the supreme court, having discretion in the granting of a writ of mandamus, will not compel by a peremptory writ the railway company to replace or put in repair its track, a part of which has been torn up, as such an order would be futile and of no public benefit."

The facts of that case show that the road had been sold, and that a private person had bought it, and had sold to another person, who had removed the rails. Among other things the court says:

"The order prayed for should only be issued in the interest of the public. If the track is replaced there is no reasonable probability that the road will be or can be operated. If a railway will not pay its mere operating expenses, the public has very little interest in the operation of the road or in its being kept in repair."

Several cases are quoted in the note to this case, the annotator admitting that they leave the question uncertain. One of these cases (Talcott v. Pine Grove, 1 Flip. 120, Fed. Cas. No. 13,735) says that a railroad cannot be abandoned after it has become one of the great thoroughfares of the country. But this is clearly an obiter dictum, having no bearing on the case whatever, the question in which was the validity of certain municipal bonds. See Pine Grove Tp. v. Talcott, 19 Wall. 666, 22 L. Ed. 227. State v. Sioux City & P. R. Co., 7 Neb. 357, was the case compelling a railroad company to keep up its entire line because of a contract growing out of land grants toward its construction. People v. Albany & V. R. Co., 24 N. Y. 261, 82 Am. Dec. 295, went off on a question as to the remedy. In Rex v. Railway Co., 2 Barn. & Ald. 648, the company was ordered to restore an abandoned tramway, designed for the use of others besides itself, but the court refused to order the maintenance of the tram road. In State v. Hartford & N. H. R. Co., 29 Conn. 538, a part of the track of the railroad was abandoned in order to prevent competition by steamboats. This was held unlawful. And so with all the other cases quoted in this note. The question is incidentally touched upon in Railroad Co. v. Dustin, 142 U. S. 499, 12 Sup. Ct. 285, 35 L. Ed. 1095, and there the court says:

"If, as in Railroad Co. v. Hall, 91 U. S. 343, 23 L. Ed. 428, the charter of a railroad corporation expressly requires it to maintain its railroad as a continuous line, it may be compelled to do so by mandamus. So, if the charter requires the corporation to construct its road and to run its cars to a certain point on tide water (as was held to be the case in State v. Hartford & N. H. R. Co., 29 Conn. 538), and it has so constructed its road, and used it for years, it may be compelled to continue to do so. And mandamus will lie to compel a corporation to build a bridge in accordance with an express requirement of statute. New Orleans, M. & T. R. Co. v. Mississippi, 112 U. S. 12, 5 Sup. Ct. 19, 28 L. Ed. 619; People v. Boston & A. R. Co., 70 N. Y. 569. But if the charter of a railroad corporation simply authorizes the corporation, without requiring it, to construct and maintain a railroad to a certain point, it has been held that it cannot be compelled by mandamus to complete or maintain its road to that point, when it would not be remunerative. Railway Co. v. The Queen, 1 El. & Bl. 858; Railway Co. v. The Queen, 1 El. & Bl. 874; Com. v. Fitchburg R. Co., 12 Gray, 180; State v. Southern Minnesota R. Co., 18 Minn. 40 (Gil. 21). In Com. v. Fitchburg R. Co., 12 Gray, 180, mandamus was refused to compel the running of passenger trains over a branch road on which this had been discontinued, after running them for a time, because they were unprofitable. The question is not as to the existence of the duty, but as to its extent and qualifications. The duty of a railroad company is not more than to meet the public wants. If trains run at reasonable and moderate fares, and cannot be supported, it is because they are not needed."

The text writer Morawetz also says:

"The duty of a railroad company to operate its road requires it merely to meet the public wants and exigencies. If there is not sufficient traffic over a particular line of road to pay for the expense of running trains, this is sufficient evidence that the public do not require it to be kept in opera-

tion. In such case the company may cease operating the road, unless this be contrary to the express terms of the charter." Mor. Priv. Corp. § 1119.

This is sustained in Ohio & M. R. Co. v. People (Ill.) 11 N. E. 350.

In Coe v. Columbus, P. & I. R. R. (Ohio) 75 Am. Rep. 524, the court says:

"If we are at liberty to suggest on what the legislature very probably relied for the continued operation of a railroad, once constructed, we should say it was the interest of the owners. If it can be operated profitably, the interest of those concerned will rarely, if ever, fail to keep it in operation so as to subserve the public use. If it cannot, we know of no mode by which the state can compel those by whom it was constructed to operate it at a loss, and certainly there is no mode provided by which it can be oper- ated at the risk of the state."

There is another point of view. The purchasers of this railroad bought it at public auction, under an order of this court. They pur- chased all the visible property of the insolvent railroad corporation, its rolling stock, roadbed, iron on the road, together with its franchises, including the rights of way. At the time they purchased, private per- sons could buy, own, and operate a railroad. The legislature of South Carolina repealed this privilege, and required all natural persons own- ing railroads to organize as a corporation within 60 days, and, failing so to do, declared that they forfeited all the franchises of the railroad company. They did not fulfill this condition. They could not be compelled to fulfill this condition. No power exists in the legislature to compel an individual to join a corporation or to compel several in- dividuals to become a corporation. They accepted the results of a failure to comply with the condition, and voluntarily forfeited its franchises. This, however, did not deprive them of their property, not included in their franchises. Being the owners of this property, hav- ing dominion over this property, they could dispose of it at pleasure. True, it had been applied to a public use. But the legislature has defeated and forbidden that use. If the purchasers, this act having been passed, cannot dispose of their property, they are deprived of it without due process of law.

So far the question has been discussed with reference to the facts and circumstances surrounding the case when the purchase was made, and the order permitting the removal of the iron was passed. Since this intervention two persons have made distinct and binding offers to lease the railroad, if it be restored, and so to operate the same. This offer comes too late. Rights have vested and acts have been done which cannot be set aside. The rails have been removed and have been sold. To restore them would require the investment of money by the purchasers, the remuneration of which will be fixed, not at its value, but at the rental value, which, in the estimation of third persons, will enable them to operate the road. Nor can these offers be taken as indicating the value of the road at the date of its sale. Apart from the fact that long experience has shown that the best test of the value of property is a sale at public auction open to all bidders, not one effort was made by any one, either among those using the road or owning property adjacent to it, either to buy it or to aid it in its extremity. Not a dollar of subscription money was used in its construction. Not a bid upon it was ever made except by

these purchasers, and two of them were holders of receiver's certificates, bidding to protect themselves. No better test could be had showing that in public opinion the property was not profitable. When the conveniences offered by the road—offered, but by no means accepted by the public—were withdrawn, then some of the public became awake to the fact that that road could have been made useful,—had been neglected. But this neither the purchasers nor the court could foresee. The value of the road, or rather its hopeless want of value as an investment, was determined by the facts existing at the time and the attitude of the public to it.

As the result of this examination, it will appear that, in the circumstances of this case, the purchasers could rightfully exercise the option of accepting the provisions of the act of the legislature by incorporating themselves within 60 days after its passage, and trying the operation of the road, or of forfeiting the franchises they had purchased; that they exercised this option, and forfeited the franchises, rendering any proceedings in quo warranto unnecessary; that thenceforward any attempt by them to exercise the franchises of a railroad company would have been unlawful; that they, being the owners of property which could not be used for the purposes of a railroad, by reason of this forfeiture, and the illegality of its use consequent thereon, could lawfully dispose of the same; that having thus taken up the rails on the road, and having sold them, this court will not compel them to buy other rails, rebuild the decayed trestles, decayed when the purchase was made, renew the cross-ties, which were also decayed at that time, and operate the railroad without remuneration.

There is another intervention in this case filed by landowners through whose lands the railroad company had rights of way. Their rights will depend upon the correctness of the adjudication on this branch of the case. As without doubt the review of an appellate court will be sought, further proceedings in the matter will be postponed to await such an adjudication.