| 94 | 291 |
| 96 | 700 |
| 96 | 701 |
| 96 | 702 |

| 94 | 291 |
| e102 | 312 |

| 94 | 291 |
| 107 | 642 |

| 94 | 291 |
| f110 | 106 |

## Richmond.

## SHERWOOD & OTHERS *v.* ATLANTIC & DANVILLE RAILWAY CO.

### February 11, 1897.

1. RAILROADS—*Purchaser under foreclosure suit—Contracts not amounting to liens—Subordinate liens—Contracts as to termini of road.*—The purchaser of a railroad under a decree in a suit brought to foreclose a mortgage thereon is discharged from the performance of all contracts of the old company which do not constitute liens on the property, and from the payment of all liens which are subordinate to the mortgage, where the purchase price is not sufficient to pay the mortgage creditors and those having priority over the mortgage. The purchaser takes the property free and discharged of all such contracts and liens. In the case at bar the contract of the old company to make the city of Portsmouth a terminus of its road is not binding on the purchaser, although he had notice of the contract.

2. RAILROADS—*Terminus fixed by charter at one of two points—Mandamus.*— Where the charter of a railroad company requires it to establish a terminus of the road at one of two points to be selected by it, the obligation imposed by the charter is satisfied by the construction and maintenance of such terminus at either of the points prescribed, and the purchaser of said railroad under foreclosure proceedings cannot be compelled by *mandamus* to establish a terminus at the other point, although such other point may, at one time, have been used as such terminus under a contract with the original company.

3. RAILROADS—*Reorganization under section 1234 of Code—Duties of new company—Branch roads—Mandamus—Case at bar.*—The duties imposed upon a new railroad company organized under section 1234 of the Code, as amended, are such duties as the original company were bound, under the terms of its charter, to perform, but no additional or higher duty is imposed on the new company than already rested upon the original company. Whether or not the original company is obliged to maintain and operate a branch or lateral road is to be determined from its charter, or the general law. The writ of *mandamus* can only be used to enforce duties and obligations clearly imposed by the charter, or general law. If power is simply conferred to construct a branch road, but its

construction is not made obligatory, the company cannot be compelled to construct such branch, or, having constructed it, to maintain and operate it to the prejudice of the rights and interests of the company. In the case at bar the new company is not bound by the contract made with the original company, and neither the charter nor the general law requires either the original company or the new to maintain and operate the branch road into the city of Portsmouth.

4. CONSTRUCTION OF STATUTES—*Intent to be sought for—How ascertained.*—In the construction of statutes, it is the duty of courts to seek to ascertain the intention of the Legislature, and in doing this, they should consider the object of the statute, and the purpose to be accomplished, but the intent is also to be sought for by giving a fair construction to the language used, attributing to the words their ordinary and popular meaning, unless it plainly appears that they were used in some other sense.

Original application for a writ of mandamus.

*Refused.*

The opinion states the case.

*J. W. Happer, R. C. Marshall* and *Christian & Christian,* for the petitioners.

*Tunstall & Thom* and *Walke & Old,* for the respondents.

KEITH, P., delivered the opinion of the court.

Sherwood and others presented their petition to this court praying that a writ of *mandamus* might issue requiring the Atlantic & Danville R. R. Co. to replace its tracks from Shoulders Hill to its former terminal station in the city of Portsmouth, and re-establish it as the terminal station of its line, and to establish and maintain its general offices, freight and passenger depots, within the city of Portsmouth, Va.

To this petition the Atlantic & Danville R. R. Co. filed its answer, and depositions were taken upon behalf both of petitioner and respondent.

From the pleadings and proofs it appears that the Atlantic & Danville R. R. Co. was incorporated by an act of the General Assembly of Virginia, approved April 21, 1882 (Acts

1881-2, p. 467), as amended by acts of February 24, 1886 (Acts 1885-6, p. 214), and May, 1887 (Acts of the Extra Session, 1887, p. 188). By its charter the railroad company was empowered, among other things, to construct, equip and maintain a railway "from any point on its main line east of the town of Hicksford, through the counties of Greenville, Sussex, Southampton, Nansemond, Isle of Wight, and Norfolk, or any and all of them, to a point on the Elizabeth river in or near the city of Norfolk, or in or near the city of Portsmouth; and also to construct branch roads in this State, none of which shall exceed sixty-five miles in length." The road from a point on the main line east of Hicksford through the counties just mentioned to West Norfolk, a point on Elizabeth river in Norfolk county, was constructed and put in operation by virtue of the charter and the several acts amendatory thereof. On the 7th of September, 1887, the railroad company executed a mortgage conveying all its works, property and franchises then owned, or thereafter acquired, to the Mercantile Trust Company, as trustee, to secure the payment of the bonds and coupons of the railroad company. After the completion of the road to West Norfolk, a point on Elizabeth river in the county of Norfolk, about seven miles distant from Shoulders Hill, negotiations were entered into between the railroad company and the city of Portsmouth, by which, in consideration of the city of Portsmouth agreeing to subscibe fcr $150,000 of the capital stock of the company, and to issue the bonds of the city payable in thirty years in payment of said subscription, the railroad company undertook to lay down its track from Shoulders Hill, which was also about seven miles from the city of Portsmouth, and to establish its terminals upon the property of the Seaboard Cotton Press Company in the said city, and to locate its general offices, freight and passenger depots, round houses, shops and freight yards, within or adjacent to the city limits. The railroad company further agreed to abolish the passenger transfer

business then existing between Norfolk and West Norfolk, and to do its passenger and local freight business through Portsmouth exclusively.

In pursuance of authority conferred upon it by the General Assembly, the city of Portsmouth ordered an election to be held to ascertain the sense of the voters upon this proposition. The election was held, the offer of the company was accepted, the bonds were issued, the road was built from Shoulders Hill to the Seaboard Cotton Press Company, and the offices, freight and passenger depots, and shops, were located in accordance with the contract, which seems to have been executed fully and in good faith by both of the parties thereto for some years thereafter. This arrangement appears to have been advantageous to the city of Portsmouth. The company, however, never prospered. From causes which need not be discussed it became embarrassed, and finally bankrupt, and on the 3d of January, 1891, B. Newgass & Co., having obtained a judgment against it for a very large sum, instituted in the Circuit Court of the United States for the Eastern District of Virginia, a suit for the sale of the property for the purpose of satisfying their judgment, and caused the property to be placed in the hands of Alfred P. Thom and Charles B. Cromwell, as receivers of the said Circuit Court. In the mean time, default having been made in the payment of the interest upon the bonds secured by the mortgage to the Mercantile Trust Company, that company became co-plaintiff in the suit; and such proceedings were had in the cause that on the 20th of November, 1893, a decree was entered for the sale of all the property and franchises of the Atlantic & Danville Railroad Company.

Pursuant to the terms of the decree, a sale was made on the 3d of April, 1894, and at the sale B. Newgass & Co., one of the complainants, and O. H. Edinger, became the purchasers, and the sale was confirmed by a decree entered on the 26th day of April, 1894. By this decree Alfred P. Thom,

who, by the death of Charles B. Cromwell, had become the sole receiver of the property, was ordered to continue to operate the line of railway after the sale and until the conveyance and delivery of it was made to the purchasers, at their risk and for their benefit.

On August 1, 1894, an order was made in the cause which directed that the premises and property should be delivered to the purchasers, and that a conveyance should be executed of all the works, property, and franchises of the railroad company. On the 2d day of August, 1894, a conveyance was executed in accordance with the terms of the decree, and the purchasers adopted in the deed the corporate name of the Atlantic & Danville Railway Company, the name of the old corporation, in accordance with the statute of Virginia in such cases made and provided, and the Atlantic & Danville Railway Co. became a corporation in the State of Virginia, and has since operated said railway.

After the sale had been made and confirmed to the purchasers, and before the execution of the deed, to-wit, on the 16th day of June, 1894, the purchasers requested the receiver to take immediate steps to abandon the Portsmouth terminal, which request the receiver submitted to the court; and thereupon the court entered a decree that the receiver ''be and is hereby permitted to abandon the city of Portsmouth as the terminus of the Atlantic & Danville Railway Company, and the use of the street leading to the terminus in said city, and so much of the route between Shoulders Hill and Portsmouth as he may think advisable.'' This order was entered on the 16th day of June, and on the 27th day of June, 1894, the receiver, pursuant to the order, abandoned the city of Portsmouth as the terminus of the railway company, and the line leading to its terminal station in the city, and removed from the city of Portsmouth all the railroad tracks of the company, its shops, and round houses, and from that time the company has failed and refused to replace the tracks and to establish

and maintain the said offices, shops, and round houses within the limits of the city of Portsmouth.

It further appears that the purchasers were fully informed at the time of the purchase of all that had taken place between the city of Portsmouth and the railway company with respect to the subscription to the stock, the issue of the bonds and of the consideration moving from the railway company. After the terminal had been established in Portsmouth, in accordance with the terms of its contract, the railway company became satisfied that the facilities afforded were altogether inadequate for the transaction of its business, and that, as compared with its terminal at West Norfolk, it was far less convenient, and in every way less desirable, and, in the opinion of the officials of the road, entailed an outlay, over and above what was necesary to handle the same business at West Norfolk, of about $27,500 annually, which constituted an important item in the burden of debt by which the road was finally overwhelmed.

At the time of the sale the claims allowed by the court and having priority over the mortgage amounted to $938,785.51. More than $4,000,000 of mortgage bonds were also represented in the suit, while the purchase price was but $1,105,000, so that, after paying the debts having priority the debt due by the mortgage only received as its distributive share a little more than three per cent. We have thus stated in some detail the principal facts connected with this controversy.

We are of opinion that the contract entered into between the Atlantic & Danville Railroad Company and the city of Portsmouth is not binding upon the present company. All contracts of the old company which did not constitute liens, and all liens which were subordinate to the mortgage which was executed on the 7th of September, 1887, to the Mercantile Trust Company, as trustee, cease to have any binding force or obligation upon the purchaser at a sale under that mortgage, but such purchaser takes the property free of and

discharged from all such liens and contracts. If it were otherwise it would, in the language of the Supreme Court of the United States, "put an end to purchases of railroads." See *Hoard* v. *C. & O. Rwy. Co.*, 123 U. S. 226, where the court says: "The persons who purchased the railroad at the mortgage foreclosure sale did not thereby, under any statute of the State, * * * or any contract of which we are aware, become obliged to pay the debts and perform the obligation of the railroad company. They bought the property of that company and its franchises, and if, as such purchasers they thereby became bound to pay all the debts and perform all the obligations of the corporation whose property they bought, it would put an end to the purchases of railroads." And so in *People* v. *Rome, W. & O. R. R. Co.*, 103 N. Y. 95: "Such a contract obligation is not a lien or charge upon the property of the railroad company, and does not devolve upon the purchaser of the property on foreclosure sale, or upon a new corporation organized under the statute to operate the road."

As is well said in respondent's brief: "We believe that this is universally recognized as law. It is based on reason as well as authority. No man or company can be allowed to mortgage property and then destroy its value by loading it up with obligations created after the mortgage is made."

In entering into a transaction of so much consequence with an insolvent corporation unable to comply with its engagements, the city of Portsmouth may have been unwise, imprudent, or unfortunate, but perhaps has no greater right to complain than the bondholders, who must content themselves with three per cent. upon their demands. ·

In so far, therefore, as the right of the petitioners to a *mandamus* is supposed to flow from any contract entered into between the city of Portsmouth and the old company, known as the "Atlantic & Danville Railroad Company," it must be denied.

By the charter of the railroad company it was required to build its road from a point upon its main line to the East of Hicksford to a point on Elizabeth river in or near the city of Norfolk, or in or near the city of Portsmouth. Under its charter it was compelled to make its teminal on the Elizabeth river. The location of that terminus was at the option of the company, a point in or near the city of Norfolk, or in or near the city of Portsmouth. It chose West Norfolk, which is on the Elizabeth river about three miles from the city of Portsmouth, and seven miles from Shoulders Hill, and there established its depots and terminals. It was the duty of the company under its charter "to build a railroad from a point on its main line East of the town of Hicksford * * * to a point on the Elizabeth river." It was required by its charter to have but one terminal on the Elizabeth river, and were we to compel it to re-establish its line into the city of Portsmouth in accordance with the prayer of the petition, then it would either be compelled to maintain two terminal points on Elizabeth river, one in or near the city of Norfolk, and another in or near the city of Portsmouth, which would be to impose upon it a duty in excess of that required by its charter, or else permit it to abandon the point originally selected by it as its terminus and make a point in the city of Portsmouth its sole terminus, when its obligation is equally as great, to say the least, to preserve its terminals at the point originally selected by it upon the Elizabeth river, when it exercises the privilege and option with which it was clothed by its charter.

We are of opinion, therefore, that in so far as the right of the petitioners to the *mandamus* prayed for depends upon the duty of the railway company to establish and maintain a terminal on the Elizabeth river in or near the city of Norfolk, or in or near the city of Portsmouth, the obligation imposed by the charter is satisfied by the construction and maintenance of its terminal at the point originally selected by it at West Norfolk.

The railroad company constructed a line from Shoulders Hill to Portsmouth in execution of the contract which it had entered into with that city, and for several years maintained and operated it from Shoulders Hill to the Seaboard Cotton Press in the city of Portsmouth, and it is contended by petitioners that if the company cannot be compelled to maintain and operate this line as its principal terminal it comes within the description of a branch road, and is within the influence of section 1234 of the Code, as amended by Acts of 1891-2, p. 623. This section as amended is as follows:

"The corporation created by or in consequence of such sale and conveyance shall succeed to all such franchise rights, and privileges, and perform all such duties as would have been had, or should have been performed, by the first company, but for such sale and conveyance, including the duty of maintaining and operating any branch or lateral road which may have been constructed and operated before the sale, and of transporting freight and passengers thereon, save only that the corporation so created shall not be entitled to the debts due to the first company, and shall not be liable for any debts of, or claims against, the said first company, which may not be expressly assumed in the contract of purchase, and the whole profits of the business done by such corporation shall belong to the said purchaser and his assigns."

Section 1234 as it is found in the Code of 1887 does not contain the words "including the duty of maintaining and operating any branch or lateral road which may have been constructed and operated before the sale, and of transporting freight and passengers thereon," and the contention is that the Legislature, in introducing by way of amendment the language quoted, intended to impose upon the company created by the sale and conveyance not only all the duties which should have been performed by the old company, but in addition thereto the duty of operating any branch or lateral road which had been constructed and operated by the original company, and it is insisted that unless this interpretation be placed upon the amendment it is wholly inoperative and meaningless.

It is true, that the present Atlantic & Danville Railway Company is a corporation created by and in consequence of such a sale and conveyance as is referred to in the section just quoted, and that it has succeeded to all the franchises, rights and privileges, and is bound to perform all such duties as would have devolved upon the first company but for such sale and conveyance, but it is obvious from the terms of the statute that it was not intended to impose upon the new company any additional or higher duty than already rested upon the original company. It is bound to perform all "such duties" as could have been required of the first company, but only such duties as could have been required of the original company. If a duty rested upon the original company to maintain and operate the line from Shoulders Hill to a point within the city of Portsmouth of such a character as a court would enforce by *mandamus*, then the new company is equally bound to perform it, and is equally liable to be compelled to do so by *mandamus*, or any other appropriate remedy. It is necessary, therefore, to consider whether or not there was a duty under the charter resting upon the old company which the courts would by *mandamus* compel it to perform, to operate and maintain the line of road in question from Shoulders Hill to a point in the city of Portsmouth; and this brings us to consider the distinction between those powers and duties conferred upon a railroad company which it may be compelled to perform and those of a merely permissive character.

The language of the charter is, "that the said corporation is * * * also hereby authorized to construct, equip, maintain, extend, and operate its railway from any point on its main line East of the town of Hicksford through the counties * * * and Norfolk to a point on the Elizabeth river, either in or near the city of Norfolk, or in or near the city of Portsmouth." Acts 1887, page 188.

By the 16th section of the charter, Acts of 1887, Extra Session, p. 191, it is said "the said railway is authorized to

construct branch roads in this State, none of which, however, shall exceed sixty-five miles in length.''

We have shown that the present Atlantic & Danville Railway Co., coming into existence as a purchaser under proceedings in a suit to foreclose a mortgage, acquired the property and franchises of the original railway company discharged of any obligation growing out of the contract between the old company and the city of Portsmouth; and that the charter of the old company imposed no duty upon it with respect to maintaining a terminal at Portsmouth beyond giving it the power to select between two points, one in or near the city of Norfolk, and the other in or near the city of Portsmouth, and both of them upon the Elizabeth river; and that this duty imposed by the charter had been fully met and satisfied by the selection, in the first instance, of a point on the river at West Norfolk; and we have also shown that the duties imposed upon the new company were only such as rested upon the old company.

In placing this construction upon section 1234 as amended, we are not unmindful of the cardinal rules which apply to the interpretation of statutes. It is the duty of the court to ascertain the intention of the Legislature, and when ascertained, to give it effect, and in the search for that intent it is its duty to consider the object of the statute and the purpose to be accomplished. It must reach the intent, however, by giving to the words used their ordinary and usual signification, and to every word and every part of the statute, if possible, its due effect and meaning. It cannot, in order to accomplish the presumed intent, place a forced and strained construction upon the language used, as that would be to enable the court to do what, in its judgment, the Legislature ought to have done rather than to interpret and enforce what the Legislature had done, and thus, in the effort to apply a remedy in a particular case, arrogate to itself a power susceptible of great abuse. The intent of the Legislature, therefore, is

always to be sought for by giving a fair construction to the language used, attributing to the words their ordinary and popular meaning, unless it plainly appears that they were used in some other sense.

In the case before us the meaning of the language used seems plain and leads to no conclusion which can be deemed absurd in itself, or necessarily repugnant to the legislative intent. It is true, of course, if we assume as a premise that the Legislature did intend to impose an additional duty upon the new company and then find as a fact that it failed to accomplish that purpose, that the repugnancy is established. But why make such an assumption? Why, we may ask, should any additional duty have been imposed upon the new company? The mere act of organization under the purchase creates no new necessity to be met by the imposition of a new duty or obligation. The needs of the community remain as they were. The same freight is to be moved, and the same passengers are to be accommodated. Why, then, should the Legislature have intended to create a duty to be discharged by the purchaser which was not incumbent upon the original company? Should the growth and development of the community tributary to a line of railway cause a demand for facilities for the accommodation of traffic which it is able, but unwilling to furnish, it cannot be doubted that there is power in the Legislature and courts, acting within their appropriate spheres, to compel the recalcitrant corporation to provide for moving the freight and passengers offered it in a satisfactory manner, and indeed to discharge any and all duties it may owe to the public, but this power would only be exercised in case of necessity, and not arbitrarily where no public necessity is shown to exist.

It may be that the object of the amendment was to require the new company to perform the duties imposed upon the old corporation subsequent to the execution of the mortgage or other lien under the sale to enforce which the conveyance

was made, and the new company organized, and to prevent the new company from evading the performance of such duties by the plea that it claimed under liens established at a time when the old corporation had not been subjected to the duty to be imposed. It is not for us, however, to indulge in mere conjecture as to the motive actuating the Legislature, for it is plain that if the intent was to impose upon the new company duties which at no time attached to the old, that intent has not been expressed, and we cannot interpolate it by construction.

We have been unable to escape the conclusion that the act requiring the new company to perform "all such duties as * * * should have been performed by the first company, * * * including the duty of maintaining and operating any branch or lateral road which may have been constructed and operated before the sale" does not impose any duty upon the new company which did not rest upon the old one.

It will scarcely be contended that there was any duty imposed upon the original company to build or to operate a branch line from Shoulders Hill to a point within the limits of the city of Portsmouth. It is true that under its charter it was permitted to build a branch line, and that, in order to induce it to build this branch, the city of Portsmouth, under authority of law, subscribed $150,000 to its capital stock, but this fact in itself furnishes a strong argument against the existence of the duty under the charter to build; for the city of Portsmouth, it is to be presumed, would have compelled the performance of the duty by *mandamus*, had it existed, rather than have resorted to negotiation and bargain and in the end pay a great price for what it might have demanded as a right. Under the charter the company was permitted, but was not required, to build this branch from Shoulders Hill to the city. The idea, however, seems to be entertained that though it was not a duty to construct this branch road,

yet that, having been constructed, it becomes the duty to main-
tain and operate it, regardless of all consequences; while, on
behalf of the company, the contention is that, having fairly
tested the advantages and disadvantages of operating the
branch line from Shoulders Hill into the city of Portsmouth,
the determination had been reached to abandon it because its
maintenance involved the cost of keeping two terminals at an
outlay wholly incommensurate with the benefits conferred,
and the demands of traffic to be accommodated by it; that
the business of the road did not justify such an expenditure;
and to continue it would put in jeopardy the existence of the
road, and might disable it to perform its duties as a carrier
of freight and pasengers on other portions of its line, and that
the provision made for the accommodation of the passengers
and freight received from and taken to the city of Portsmouth
was, under the conditions and circumstances, reasonably
sufficient.    The evidence strongly tends to maintain these
positions of the respondent.

In *Commonwealth* v. *Fitzburg R. Co.*, 12 Gray 180, it is
said: "It is plain that the power to judge of what is neces-
sary or reasonable in the premises, is, except in those cases
where the Legislature has expressly intervened, in the first
instance in the corporation.    It is clear that the duty required
is not more than to meet and supply the public wants.    These
are measured by the business actually done, or what could be
clearly shown would be done, if increased facilities were
granted.    There is nothing in the language of the statutes
requiring, nor can any just implication from the powers and
privileges conferred upon the corporation require, that trains
for passengers or freight should be provided, which are not
wanted, or which the business upon the road would utterly
fail to support.    *    *    *

"It would seem to be, therfore, not only its right, but its
duty, to exercise a sound discretion in the use of its capital,
lest by exausting it upon trains that were not required by the

public wants, it should deprive itself of the means of running at reasonable rates those that were.

"The point is made in the argument for the Commonwealth, that because for a time the respondents have maintained the road in running regular trains for freight and passengers they are bound to continue to run until authorized by the Legislature to stop.   We cannot see that a beginning to run these trains rendered their continuance at whatever cost or sacrifice, a legal duty.   It might be more plausibly said that it was the duty of the corporation, after a road was built, to make the trial of running regular trains for pasengers and freight; that they were not to presume beforehand that the business would be inadequate; that it was difficult to foresee or anticipate all the business which would find its way to the road, and therefcre the experiment should be fairly made. But when trial had been fairly made and had proved disastrous, the duty would have been discharged."

See also Rorer on Railroads, 43; *State* v. *Sioux City R. R. Co.*, 7 Neb. 357, 374; and *People* v. *Rome, Watertown & Ogdensburg R. Co.*, 103 N. Y. 106.

See also Morawetz on Corp., sec. 1119, where it is said: "The duty of a railroad company to operate its road requires it merely to meet the public wants and exigencies.   If there is not sufficient traffic over a particular line of road to pay for the expenses of running trains this is sufficient evidence that the public do not require it to be kept in operation; and in such case the company may cease operating the road, unless this be contrary to the express terms of its charter."

In *Northern Pacific R. Co.* v. *Dustin*, 142 U. S. at pp. 498-9, the court uses the following language: "A writ of *mandamus* to compel a railroad corporation to do a particular act in constructing its road or buildings, or in running its trains, can be issued only when there is a specific legal duty on its part to do that act, and clear proof of a breach of that duty.

"If," as in *Union Pacific R. R.* v. *Hall*, 91 U. S. 343, "the charter of a railroad corporation expressly required it to maintain its railroad as a continuous line, it may be compelled to do so by *mandamus*. So if the charter requires the corporation to construct its road, and to run its cars to a certain point on tidewater (as was held to be the case in *State* v. *Hartford & N. H. R. R.*, 29 Conn. 538), and it has so constructed its road, and used it for years, it may be compelled to continue to do so. And *mandamus* will lie to compel a corporation to build a bridge in accordance with an express requirement of statute.

"But if the charter of a railroad corporation simply authorizes the corporation, without requiring it, to construct and maintain a railroad to a certain point, it has been held that it cannot be compelled by *mandamus* to complete or to maintain its road to that point, when it would not be remunerative."

These authorities, which seem to be consonant with reason, establish the proposition that the writ of *mandamus* can only be used to enforce duties and obligations clearly imposed by the charter or general law, and not to enforce and establish those of doubtful expediency and propriety.

It may be asked, is a corporation having constructed a road to be permitted to abandon its use at its pleasure? We answer that it is not to be apprehended that the corporation will abandon any part of its line, the operation of which is found remunerative in the present, or that is likely to become so in the future. Where the line of railway, taken as a whole, cannot be profitably maintained; where its operation, when discreetly and economically managed, is attended with loss, it is difficult to perceive how a court can, by *mandamus* or otherwise, compel its operation to be continued. If the loss is the result of improvident and unthrifty management, the court may, at the suit of those interested, take charge of it for the benefit of all concerned, and run it through the instrumentality of a receiver, but if the traffic of the road is really

insufficient to support a wise and economical administration of its affairs there would seem to be no escape from its ultimate abandonment.   Such cases are possible, though rare. It more frequently happens, however, that a part of the line becomes unprofitable, though the system as a whole may be valuable.   In such an event the court will enquire, first, as to the positive duties imposed by the charter, and compel their performance by appropriate remedies, while with respect to those duties which were not imposed by the charter, but which have been assumed by the corporation under permissive grants of power, it will consider all the circumstances of the case, and if upon the facts it shall appear that the duty unfulfilled inflicts no particular injury or hardship upon those who make the complaint, and that the service which they receive is under all the conditions reasonably adapted to their needs, while the performance of the duty would entail a burden and loss upon the company far in excess of any benefit conferred, and which might in its ultimate effect embarrass or prevent the performance of other duties with respect to larger interests, and affecting a far greater number of citizens, the court will withhold its hands.

This proceeding, while in the name of certain citizens of Portsmouth, is in effect on behalf of the Commonwealth, and the courts should not require an act to be done which, while it may enure to the benefit of a few, might end in disaster to the interests of many.

We have said nothing in the course of this opinion with respect to so much of the prayer of the petition as asks for the re-establishment in the city of Portsmouth of the depots, round-houses, and shops, for if the petitioners have not made out a case for the restoration of the roadway, it is yet more certain that they have failed to present a case calling for the interference of the court with respect to the other subjects of their contention.

The writ of *mandamus* is refused.

*Mandamus Refused.*