## TULSA ST. RY. CO. v. STATE.

No. 1107.  Opinion Filed June 22, 1910.

(110 Pac. 373.)

1. COUNTIES—Powers of Board of Commissioners. A board of county commissioners can exercise such powers only as are conferred upon it by the Constitution or the statutes, or such as may arise by necessary implication from an express grant.

2. COUNTIES—Power of Board of Commissioners—Grant of Franchise to Railroad. It is beyond the power of a board of county commissioners to enter into a contract and grant a franchise to an electric street railway company to construct its line over the public highways of a county, and therein grant terms and make conditions absolving and relieving it from the general supervision, regulation, and control conferred by the Constitution upon the Corporation Commission over such companies.

3. APPEAL AND ERROR—Order of Corporation Commission—Remand for Additional Evidence. Where, on appeal from an order of the Corporation Commission, evidence is lacking reasonably sustaining certain material findings, but it is made to appear in the record that the same probably exists, the said order will not necessarily be reversed and the case closed, but, where justice requires it, the same will be reversed and remanded to enable the parties to produce such evidence on which a new order may be predicated.

(Syllabus by the Court.)

*Appeal from the Corporation Commission.*

Action by the State against the Tulsa Street Railway Company. From an order of the Corporation Commission, defendant appeals. Reversed and remanded.

*Phillip Kates,* for plaintiff in error.—Citing: *C., R. I. & P. Ry. Co. v. State,* 24 Okla. 370; *Regan v. Loan & Trust Co.,* 154 U. S. 352; *A., T. & S. F. Ry. Co. v. State,* 23 Okla. 210; *W. U. Tel. Co. v. Railroad Com.,* 74 Miss. 80; *Railway Co. v. Becker,* 35 Fed. 883.

*Chas. West,* Atty. Gen., and *George A. Henshaw,* Asst. Atty. Gen., for the State.

DUNN, C. J.   September 9, 1909, on a complaint duly filed, the Corporation Commission of the state made the following order in the above-entitled case:

"The complaint alleges in substance that the defendant owns and operates a street railway system in the town of Tulsa, and that it has a road built and in operation from the city of Tulsa to the fair grounds; that it only runs cars from this part of its system during fairs or some other amusements by which people are attracted to the fair grounds; that it operates its main system within about a half mile of the fair grounds. The complaint prays that the defendant be required to install regular service to the fair grounds. The defendant contends that it cannot operate a regular service over this part of its road without sustaining a loss, and that there is insufficient number of people in that vicinity to justify the service, except upon special occasions during the races or fair.   The evidence shows that there is from 100 to 150 people that live within the vicinity of this road at the fair grounds; that the street railway company operates a regular 15 minutes service to and within one-half mile of its terminus at the fair grounds, and is now preparing to operate 30 minutes service to Kendall College.   The evidence shows that among the people residing near the fair grounds are girls who work in stores and some business men; that there are some 75 to 100 horses kept in training at the fair grounds which would necessarily require several keepers.   It is contended by the defendant that the revenues from the operation of this part of the road would not justify the installation of an additional car to take care of this service, and introduced evidence to support this contention.   However, the Commission can readily see that if any portion of a street railway system was segregated from the other portion, and it became necessary to run a car for this particular portion and this car was not permitted

to do other service, the same may not be remunerative. The Commission does not find from the evidence that it would be necessary to run this special car to perform this service; that the car that runs to Kendall College could by running one-quarter of a mile from a junction point where it turns to go to Kendall College serve the people in this vicinity of the fair grounds with but slight additional expense, or the regular schedule could be adjusted so that one car could go to the fair grounds a sufficient number of times during the day to conveniently serve the people in that vicinity. The Commission further finds from the evidence that the defendant built this road on a public highway, and that it is the duty of the defendant to properly serve the people on its system of street railway and that the reasonable. necessities and conveniences of the people in that vicinity require the service. It is therefore ordered that the defendant, the Tulsa Street Railway, operate a car to leave the fair grounds at 7:30 a. m.; and at 8:30 a. m., and 12m.; at 1 p. m., at 4:30 p. m., at 5:30 p. m., at 7:30 p. m.; and 10:30 p. m.; that a reasonable adjustment or change of this schedule so as to be operated in conjunction with the other part of the defendant's system may be made by the defendant; and that it is meant by this order that the service shall be installed and operated to the fair grounds substantially as set forth above. This order shall take effect on and after the 30th day of September, 1909."

From this order defendant the Tulsa Street Railway Company has appealed to this court, asking that the same be reversed, and as grounds therefor alleges that the line of road which was constructed from the city limits of Tulsa to the fair grounds was built under and by virtue of an agreement or franchise had with and granted by the board of county commissioners of Tulsa county, the terms of which were as follows:

"The purpose of granting this right is to secure for the city and county of Tulsa adequate transportation facilities to the fair grounds of the Tulsa Fair Association, and the Tulsa Street Railway Company, for itself, its successors and assigns, does hereby agree to construct, operate, and maintain said line of railway in consideration of this right and franchise and to give such transportation facilities over said line of railway as shall be suitable

and necessary to the public interests on occasions when public events and entertainments are in progress at said fair grounds. It is distinctly agreed, however, that the Tulsa Street Railway Company, its successors and assigns, shall not be required to maintain any regular schedule over said line of railway, except as required by the foregoing provision."

It is the contention of defendant that, having accepted and constructed its line under and by virtue of the terms of this agreement, the Corporation Commission has no power to require any action in conflict therewith; counsel in his brief stating:

"The action of the Commission in this case is to vacate the express terms of one agreement, and substitute another, of its own making. If the franchise of the county commissioners in this case be valid, then the Tulsa Street Railway Company is bound by law to no other service than that required by the terms of that franchise, and that franchise cannot be changed without the assent of both parties thereto."

The authority under which the Corporation Commission acted is contained in section 18 of article 9 of the Constitution, but defendant contends that the following limitation contained therein excepts from the jurisdiction of the Commission public service corporations within its class and enjoying contracts such as is shown herein. This exception is as follows:

"Provided, however, that nothing in this section shall impair the rights which have heretofore been, or may hereafter be, conferred by law upon the authorities of any city, town, or county to prescribe rules, regulations, or rates of charges to be observed by any public service corporation in connection with any services performed by it under a municipal or county franchise granted by such city, town or county, so far as such services may be wholly within the limits of the city, town, or county granting the franchise."

Section 1409 of the Compiled Laws of Oklahoma of 1909 authorizes any city or town to permit any street railway system to construct its line upon the streets thereof and upon such terms and conditions as may be agreed upon between the company and the municipality, but we have not had our attention called to any

such authority conferred upon the board of county commissioners in the state, and we know of none. A board of county commissioners being created for a special purpose can exercise such powers only as are conferred upon it by the Constitution or statutes of the state along with such powers as may arise by necessary implication from an express grant. 11 Cyc. 390, and authorities cited. And, in order that defendant may take itself from without the operation of the authority and power conferred upon the Corporation Commission to supervise, regulate, and control all transportation and transmission companies doing business in the state in all matters relating to the performance of their public duties (Const. § 18, art. 9), it is necessary to establish that the contract which it entered into was one within the power of the board of county commissioners to make. This it has not done; hence, the Corporation Commission had as full and complete authority to act in the premises as it would have had if the alleged contract or franchise upon which defendant relies had no existence.

The remaining question goes to the proposition of the reasonableness and justness of the order. This necessitates an investigation of the evidence offered. A witness called by complainant testified that there were between 40 and 50 families living in the neighborhod of the fair grounds, and that the distance from the present terminus to the fair grounds is between a half and three-quarters of a mile. The auditor of the railway company testified that the line was built for the purpose of accommodating persons on the occasion of public entertainments at the fair grounds, and that the cost of operating a car on any regular schedule on this extension including only cost of power, wages of trainmen, and maintenance of car, would be $14.50 per day, and including all expenses $17.83 per day; that, in order to maintain a schedule on this line, the equipment of the company limited as it then was would necessitate the purchase of another car at the cost of $3,500, and that the receipts based on the estimate of the number of people who would

travel would not exceed $5 per day; that beginning September 15, 1909, the street railway company would maintain a 30-minute schedule to Kendall College, which would provide service to within 1,300 feet of the fair grounds. He also testified that, to maintain the service in town, it was necessary to run the cars on a very close schedule; that it was a single track system; that on the occasions when service was maintained on this line during fairs the schedule in town was practically abandoned because most of the people went to the fair, and that to run to the fair grounds once an hour or two hours about noon, and two hours about bedtime, six or eight hours every day, would so disarrange the schedule that it would take the remainder of the day to get back to it. The auditor of the Corporation Commission testified that the annual report of the company for the fiscal year ending June 5, 1908, showed the total gross earnings from its operations to be $31,-614.18, and that the total operating expenses for that year were $17,159.95, leaving the earnings, $14,454.23, out of which was to be paid the interest and taxes of the company. There is no showing as to the amount of these items nor of the cost of the construction of the road. Nor is there any evidence supporting the finding that the car which serves Kendall College could serve the people in the vicinity of the fair grounds with but slight additional expense, or that the regular schedule could be adjusted to accommodate such service. Neither the testimony given by the company nor that given by the auditor of the Commission appears from the order of the Commission to have received that consideration to which it seems to us to be fairly entitled. From the testimony of the auditor of the company manifestly the extra service required could only be furnished at an excessive loss to the company, and, while it is true that incidental service may be required of public service corporations even at a loss when the public necessities require it, yet such service as a rule cannot be required of any concern where it will result in a loss upon the whole property, and

this is oftentimes a controlling circumstance. It is said in the case of *Jack v. Williams et al.* (C. C.) 113 Fed. 823:

"In the absence of special circumstances, or an express contract embodied in a charter, the owner of a railroad, whether a corporation or individual, cannot be compelled to maintain and operate the same at an actual loss. The duty arising from the ownership of the franchise is merely to meet the public requirements, and, where the traffic on a road is not sufficient to pay its operating expenses, such duty does not require its operation, and it may be abandoned."

And in one of the old cases, *Commonwealth v. Fitchburg Railroad Co.,* 12 Gray. (Mass.) 180, it is said in reference to an action brought to compel a railroad company to operate one of its branch lines where the same could only be done at a loss:

"It is to be considered that the respondent corporation has under its charter other roads to maintain, and other duties to the public to discharge, and the running of passenger trains on these branches might exhaust its resources and render it incapable of discharging these other duties. It would seem to be therefore not only its right, but its duty, to exercise a sound discretion in the use of its capital, lest by exhausting it upon trains that were not required by the public wants it should deprive itself of the means of running at reasonable rates those that were."

And in a recent case from the Supreme Court of Virginia, *Sherwood v. Atlantic & D. R. Co.,* 94 Va. 291, 26 S. E. 943, wherein mandamus was brought to require a railway company, not withstanding it could only be done at a loss, to reinstate services upon one of its branch lines which involved the maintainance of two terminals, it is said:

"Under the charter the company was permitted, but was not required, to build this branch from Shoulders Hill to the city. The idea, however, seems to be entertained that, though it was not a duty to construct this branch road, yet that, having been constructed, it becomes the duty to maintain and operate it regardless of all consequences; while, on behalf of the company, the contention is that, having fairly tested the advantages and disadvantages of operating the branch line from Shoulders Hill into the city of Portsmouth, the determination had been reached to

abandon it because its maintainance involved the cost of keeping two terminals at an outlay wholly incommensurate with the benefits conferred, and the demands of traffic to be accommodated by it, that the business of the road did not justify such an expenditure, and to continue it would put in jeopardy the existence of the road, and might disable it to perform its duties as a carrier of freight and passengers on other portions of its line and that the provisions made for the accommodation of the passengers and freight received from and taken to the city of Portsmouth was under the conditions and circumstances reasonably sufficient. * * * It may be asked, is a corporation having constructed a road to be permitted to abandon its use at its pleasure? We answer that it is not to be apprehended that the corporation will abandon any part of its line the operation of which is found remunerative in the present, or that is likely to become so in the future. Where the line of railway, taken as a whole, cannot be profitably maintained, where its operation, when discreetly and economically managed, is attended with loss, it is difficult to perceive how a court can, by mandamus or otherwise, compel its operation to be continued. If the loss is the result of improvident and unthrifty management the court may, at the suit of those interested, take charge of it for the benefit of all concerned, and run it through the instrumentality of a receiver, but, if the traffic of the road is really insufficient to support a wise and economical administration of its affairs, there would seem to be no escape from its ultimate abandonment. Such cases are possible though rare. It more frequently happens, however, that a part of the line becomes unprofitable, though the system as a whole may be valuable. In such an event the court will inquire, first, as to the positive duties imposed by the charter, and compel their performance by appropriate remedies, while with respect to those duties which were not imposed by the charter, but which have been assumed by the corporation under permissive grants of power, it will consider all the circumstances of the case, and if upon the facts it shall appear that the duty unfulfilled inflicts no particular injury or hardship upon those who make the complaint, and that the service which they receive is under all the conditions reasonably adapted to their needs, while the performance of the duty would entail a burden and loss upon the company far in excess of any benefit conferred, and which might in its ultimate effect embarrass or prevent the performance

of other duties with respect to larger interests, and affecting a far greater number of citizens, the court will withhold its hands."

The case of *Brown v. Janesville City Railway Co.*, decided by the Railroad Commission of Wisconsin March 10, 1910 (4 Wisconsin Railroad Commission Rep. 757), was one wherein a street railway in the city of Janesville had ceased to operate a portion of its trackage on the ground that it was unremunerative, and that its expenses were in excess of its income on that particular branch. It also appeared that the entire concern had been operated at a loss. The proceeding was brought to compel it to reinstate that service, and the commission in the consideration of the case said:

"It seems to be well established that a railway company may not abandon a portion of its line merely because such portion is unremunerative, but must operate its line as a whole. Nevertheless, if the entire road cannot be operated, except at a loss, when economically managed, nothing can prevent the company from abandoning the enterprise and forfeiting its charter and franchise. Such instances are quite rare, yet they have occurred in the past, as appears from the cases cited. It may also occur, as in the instant case, that a railway system will not earn sufficient revenue to pay the cost of operation and maintainance because one or more branches thereof cannot be operated except at a loss more than counterbalancing the profits on the rest of the system. Under such circumstances, if the company should discontinue operation of the unprofitable portion of its line in order to maintain service upon the remainder of the line, would the public not suffer from any action intended to compel the performance of the legal obligation resting upon the company to operate every part of the system? To place the respondent company in the position of being required to operate all its lines at a loss might inevitably result in the abandonment of all service on all lines and a forfeiture of franchises."

The extension of the company's track to the fair grounds was constructed by it for the purpose of operating cars thereon at times of public entertainments, ballgames, race meets, and fairs. It was not constructed, as is shown by its so-called franchise, with the view of maintaining a regular schedule thereon. However, a number of people doing business and having occasion to visit the city

daily have erected their homes and are living near the fair-ground terminus of this line of the road. It enjoys the privileges under which it operates by virtue of grants from the public—i, e., its occupation of the public highway and the right to charge and receive fares—and owing to the exclusive character of its line, as no other street railway will likely be built to serve these people while it occupies that field, it owes, by virtue of its privileges, a duty to serve these people if it can be done within reasonable bounds. As above noted, there was no evidence offered before the Commission to sustain its finding that the company with but slight additional expense could render street car service to its prospective patrons near the fair grounds, and do this without seriously discommoding its city schedule, nor to fix definitely the extent of the same. This court in the case of *St. Louis & San Francisco Ry. Co. v. Newell,* 25 Okla., 502, 106 Pac. 818, said in reference to the *prima facie* presumption accompanying orders of the Commission appealed to this court that the same does not apply where a fact material to show the reasonableness and justness and correctness of the order is lacking in the finding of the facts made by the Commission, and is not supplied by the evidence, and in such a case on review in this court the order cannot be sustained. Nor was any evidence offered and considered by the Commission showing the net earnings of the company upon which there might be predicated a finding that, although there might be an incidental loss in furnishing the service demanded on this line, yet in the operation of the entire system the stockholders and others interested were afforded a fair return upon their entire investment. This evidence probably exists, and, in order that these deficiencies may be supplied, and the Commission be given full information thereon, the case is reversed and remanded for that purpose.

All the Justices concur.