## Potter Matlock Trust Company, Trustee v. Warren County and City of Bowling Green.

(Decided January 21, 1919.)

## Appeal from Warren Circuit Court.

1. Street Railroads—Abandonment of When Unprofitable to Operate. —Where a street railway company that has secured permission to use the streets and highways for the construction of its road and operation of its cars for a specified time cannot continue its operation as a whole under good business management except at a loss it may be permitted to remove its tracks and equipment and abandon the road upon restoring the highways, if there is no contract obligation upon the part of the company to operate its road for a specified time.

2. Street Railroads—Constitutional Law—Cannot be Compelled to Operate at Loss.—To require a street railway company to operate its road at a loss in the absence of a contract obligation to do so would be in effect taking private property for public use without compensation in violation of section 13 of the Constitution.

3. Street Railroads—Abandonment of Not Allowable in Violation of Contract.—Where there is a contract obligation upon the part of a street railroad company to operate its road for a specified time it may be compelled to do so for the time specified, although at a loss.

4. Street Railroads—Permission to Use Streets Does Not Constitute Binding Contract to Operate for Time Specified.—Where a city by ordinance granted to a street railway company the privilege of occupying the streets in the construction and operation of its road for a specified time the grant did not amount to a contract obliging the company to operate its road at a loss for the time specified.

5. Street Railroads—Performance of Service Under Permissive Grant to Occupy Streets.—Where a public utility corporation undertakes by virtue of permissive grants the performance of public service, this undertaking, when it can be performed under efficient management with fair profit, carries with it the duty of performing the service in such a way as that the public interest will be served.

6. Street Railroads—Conditions of Permissive Grant Cannot Be Broken by Either Party.—Where a street railway company se-

cures by ordinance permission to occupy the streets of the city, neither party should be permitted to break or alter the conditions of the grant to the prejudice of the other or the public. Both parties must fulfill the purpose of the grant in the manner and for the period of time specified.

7.  Street Railroads—Abandonment of—Receivership.—When it is doubtful whether a street railway company that was under no contract obligation to do so can operate its road at a reasonable profit on account of mismanagement or dissension, the court should put the road in the hands of a receiver for the purpose of testing its ability to be operated except at a loss

WRIGHT & McELROY and T. W. & R. C. P. THOMAS for appellant.

G. D. MILLIKEN, GUY H. HERDMAN and O. P. ROPER for appellees.

OPINION OF THE COURT BY CHIEF JUSTICE CARROLL—Reversing.

A statement of some pertinent facts appearing in the record that preceded the beginning of this litigation, as well as a review of the litigation, will be helpful in reaching a solution of the controlling question in the case, which is—Can a street railway company, operating under a franchise granted by the city and county, remove its rails and equipment and permanently abandon the operation of the road if it appears that it cannot be operated except at a loss?

Some years ago the council of Bowling Green, by an ordinance, granted to the Park City Railway Company, the predecessor in title of the Southern Traction Company, a "right-of-way over the following described streets of the city of Bowling Green, subject to the rules, regulations and restrictions herein set forth."

The ordinance described the streets on which the company might construct and operate its railway and contained a number of provisions regulating the manner in which the streets should be used and kept in repair, the fares that should be charged, the license tax that should be paid, and other matters connected with the operation of the roads.

The privilege thus granted was to run for a term of fifty years, which has not yet expired.

The fiscal court of Warren county also granted to the railway company the privilege of using and occupying the public ways of the county for a term of twenty years,

not yet expired. This order also contained some provisions concerning the manner in which the highway should be maintained, the tracks should be laid, as well as others regulating the operation of the road.

Neither the ordinance enacted by the council nor the order adopted by the fiscal court contained any stipulation that the street car company should operate its road for the time specified in the grants or for any length of time, although the company had the right, under the grants, to use the highways and operate its road for the time specified. Nor did either of the grants give to the company the exclusive right to the use of the streets or roads or contain any provisions that would prevent the city from granting other like privileges to other companies. In brief the grants merely authorized and permitted the company to construct its line of road along highways and streets named and operate cars thereon for the time specified.

Under the authority of these two grants the street railway company constructed its line of road in the county and city and operated cars thereon for a number of years.

In 1914 the railway company executed to the Potter Matlock Trust Company, as trustee, a mortgage on its property to secure the payment of bonds amounting to twenty-four thousand and five hundred dollars; and in 1916 the trust company brought a suit against the railway company and other persons asking that its mortgage lien be enforced and the property covered by the mortgage, which included everything the street railway company owned, as well as the franchises and rights granted to it by the city and county, be sold as a going concern upon the ground that the railway company was insolvent and had defaulted in the payment of the interest on the bonds, thus precipitating the maturity of the debt.

In answer to this suit the railway company and the other defendants named denied that the company was insolvent and set up that its embarrassed financial condition and inability to pay the interest on the bonded debt was due to the mismanagement of its affairs.

In October, 1917, there was a judgment granting the relief prayed for by the trustee and ordering a sale of all the property rights and franchises of the railway company as a going concern, but before a sale was made under this judgment, and on October 25, 1917, the railway company entered into a contract with Hirsch and

Sons by which, in consideration of twenty-one thousand dollars, to be paid in cash, it sold to Hirsch and Sons, with the consent of the directors and the trustee for the bondholders, all of its physical property, agreeing that its rails, ties and all other equipment might be removed. In other words, under this contract, the operation of the road was to be permanently abandoned and all of its physical property taken down and removed by Hirsch and Sons. It further appears that when this contract was made, the judgment ordering a sale of the road was, by agreement of all parties concerned, set aside. It is obvious from this that the owners, the trustees for the bondholders and perhaps the other creditors, concluded that the sale to Hirsch and Sons for twenty-one thousand dollars would be more beneficial to them than a sale of the road under the judgment; therefore, they agreed that the judgment should be set aside in order that the contract with Hirsch and Sons might be carried out.

A few days after this contract with Hirsch and Sons was entered into, and in October, 1917, the county of Warren and the city of Bowling Green filed in the Warren circuit court suits against the railway company and Hirsch and Sons, asking for an injunction to restrain Hirsch and Sons from taking down or removing the physical property and equipment of the railway company. When this injunction suit came on to be heard the judge of the circuit court granted the injunction prayed for and made an order restraining the railway company from selling its physical property and Hirsch and Sons from taking down and removing any of the equipment.

When the order granting the injunction was entered a motion was made by the railway company and Hirsch and Sons before a judge of this court to dissolve it in order that the contract between the railway company and Hirsch and Sons might be carried out; but the judge of this court, to whom the application was made, and the other judges who sat with him in hearing the application, refused to dissolve the injunction granted by the circuit judge and in the course of a brief opinion said:

"We did not consider or determine the question whether under any circumstances a street railway company that has obtained a franchise to operate a line of railway may, in opposition to the will of the municipality from whom the franchise was obtained, abandon its line of road and remove its rails, poles, cars and other

equipment, but we all agreed that in any event before a company should be permitted to do this, it should be made plain that it could not operate its road except at a loss.

"We concur in what Judge Moss said, that "if these bondholders and the stockholders, who are the same parties, do not desire a foreclosure and a sale so as to determine whether or not by that means a purchaser could be obtained who would be willing to undertake the operation of the street railway, then they must continue themselves to operate, and if at any time they shall fail to do so, it might become proper and necessary for the court to take control through a receiver and to operate same until it could be determined, either by exposing it for sale, or by some other proper method, whether or not said railway is capable under reasonably economical and efficient management, of being operated and continued as a going concern. The interest of the public demands the most thorough testing of that question before permitting the utter destruction of the value of the property as a street railway.'"

It further appears from the record that while these injunction proceedings were pending, the suit filed in 1916 by the Potter Matlock Trust Company, as trustee, for a sale of the road, and in which there was a judgment that was set aside as before stated, was yet on the docket of the Warren circuit court, and in February, 1918, the Potter Matlock Trust Company, as trustee, filed an amended petition in which, after setting up the insolvency of the railway company and its default in the payment of interest, averred that the property of the railway company could be sold for a great deal more if dismantled and sold as junk, than the road and its property and privileges could be sold for as a going concern with an obligation upon the part of the purchaser to continue its operation; and therefore it prayed that the court order a sale of the road, its property and privileges as a going concern with an obligation upon the part of the purchaser to continue its operation, and also order a sale of all its physical property with the privilege to the purchaser to take down and remove the same, both sales to be made at the same time, and that one to be approved by the court which realized the larger sum.

To this amended petition the county of Warren and the city of Bowling Green filed answers resisting the

effort of the trustee to have the physical property of the road sold as junk, which would, of course, result in the permanent abandonment of the road.

Upon hearing the issues raised by the amended petition and answers thereto, together with the evidence offered thereon, the court adjudged that the road and all of its property and franchises should be sold as a whole, with an obligation upon the part of the purchaser to operate it, and further adjudged that the trustee was not entitled to a judgment for a sale of the physical property of the road with the right to remove the same. To so much of this judgment as refused to permit the physical property to be sold as junk and removed, the trustee for the bondholders prosecutes this appeal.

Returning now to what we conceive to be the principal question in the case, our opinion is that when it has been clearly demonstrated that a street railway company, that has secured the privilege as this company, or its predecessor did, to construct and operate a line of road, cannot continue its operation as a whole under good business management except at a loss, the company may be permitted to remove all its tracks and equipment and abandon the road upon restoring the highways it occupied, in so far as they were occupied by its tracks and other equipment, to the condition of the remainder of the adjacent highways at the time the abandonment took place.

But in announcing this principle we wish it to be distinctly understood that its applicability is to be confined to a state of case similar to that presented by the record. We do not mean to go so far as to say that where there was a contract obligation upon the part of the company to operate its road for a specified time, that it might, upon a showing that the road could not be operated even under efficient management except at a loss, abandon the operation of the road before the term stipulated in the contract had expired.

It seems to us there is no reason why a contract obligation should not be enforced in this character of cases with the same vigor and fullness as in others where contract obligations are assumed and the rights of the parties are to be determined by the terms of the contract and not by the profit or loss that may result in performing its conditions. In this case, however, there was no contract obligation contained in the ordinance of the city or

the order of the fiscal court imposing upon the company the duty of operating its line of road for any specified time. It was simply granted the right to use and occupy for a described period the streets and highways mentioned in the grants, and while the grants of these privileges would in themselves put upon the company the duty of continuing the operation of the road for the duration of the grants, if under efficient management it could be operated at a reasonable profit, we do not think the terms or conditions of the grants should be construed to require the owners of the company to continue the operation of the road when to do so would cause them to suffer loss, although they had exercised good business methods in managing the affairs of the company. Stiles v. Citizens Electric Street Railway Co., 199 Mass. 394, 19 L. R. A. (N. S.) 865; San Antonio Street Railway Co. v. State, 90 Tex. 520, 35 L. R. A. 662; State of Iowa v. Old Colony Trust Co., 315 Fed. 307, L. R. A. (1915A) 549.

It is true that when public utility corporations undertake by virtue of permissive grants made by public authority, as this company did, the performance of a public service, this undertaking, when it can be performed under efficient management with fair profit to the owners, carries with it the duty of performing the service in such a way as that the public interest and convenience will be served in the manner contemplated by the terms of the grants and for the time therein specified.

Under conditions like these neither of the parties to the contract should be permitted to break it or to alter its terms or conditions to the prejudice of the other or the public for whose use and benefit the contract was entered into. Both parties must fulfill the purpose of the grant in the manner and for the period of time specified. City Railway Co. v. Citizens Street Railway Company, 166 U. S. 557, 41 Law Ed. 1114; Clarksburg Electric Light Co. v. City of Clarksburg,——W. Va. (1900), 50 L. R. A. 142; Louisville Home Tel. Co. v. City of Louisville, 130 Ky. 611; Cumberland Tel. Co. v. City of Hickman, 129 Ky. 220; Chesapeake & Ohio R. R. Co. v. City of Dayton, 177 Ky. 503.

But we are also sure that private individuals in the absence of a contract obligation are not under a duty of any kind to serve the public at a loss to themselves. Where there is no contract obligation the public has no right to expect or demand that private individuals will, to their

own loss, continue a service that under efficient manage-
ment will not return to them a reasonable profit on their
investment.

To say that the owners of a public utility company
must in the absence of a contract obligation continue to
render the service contemplated by a merely permissive
grant to use public ways, although it could not be done
under efficient management without a loss, would be in
effect holding that private property might be taken for
public use without compensation, and of course this can-
not be done. There would be little difference, as it seems
to us, between a ruling that the private property of an in-
dividual might be boldly taken without compensation for
some public use and a holding requiring the private indi-
vidual to render under a grantlike the one here in question
a public service at a personal loss to himself. To auth-
orize the doing of either one or the other of these things
would plainly be a violation of the provision contained in
section 13 of the Constitution that "nor shall any man's
property be taken or applied to public use . . . with-
out just compensation being previously made to him."

The views we have expressed appear to be so sound
as not to require citation of authority in support of them
but authority is not wanting. In Northern Pacific Rail-
way Company v. Territory of Washington, 142 U. S. 492,
35 Law Ed. 1092, the court said: "But if the charter of
a railroad corporation simply authorized the corpora-
tion, without requiring it to construct and maintain a
railroad to a certain point, it has been held that it can-
not be compelled by mandamus to complete or maintain
its road to that point when it would not be remuner-
ative."

In Sherwood v. Atlantic Railroad Company, 94 Va.
291, the court, in considering the question whether a rail-
road company could be compelled by mandamus to oper-
ate its road at a loss to the stockholders, said: "Where
the line of railway, taken as a whole, cannot be profitably
maintained; where its operation, when discreetly and
economically managed, is attended with loss, it is difficult
to perceive how a court can, by mandamus or otherwise,
compel its operation to be continued. If the loss is the
result of improvident and unthrifty management, the
court may, at the suit of those interested, take charge of
it for the benefit of all concerned, and run it through the
instrumentality of a receiver, but if the traffic of the road

is really insufficient to support a wise and economical administration of its affairs there would seem to be no escape from its ultimate abandonment. Such cases are possible, though rare. It more frequently happens, however, that a part of the line becomes unprofitable, though the system as a whole may be valuable. In such an event the court will inquire, first, as to the positive duties imposed by the charter, and compel their performance by appropriate remedies, while with respect to those duties which were not imposed by the charter, but which have been assumed by the corporation under permissive grants of power, it will consider all the circumstances of the case, and if upon the facts it shall appear that the duty unfulfilled inflicts no particular injury or hardship upon those who make the complaint, and that the service which they receive is under all the conditions reasonably adapted to their needs, while the performance of the duty would entail a burden and loss upon the company far in excess of any benefit conferred, and which might in its ultimate effect embarrass or prevent the performance of other duties in respect to larger interests, and affecting a far greater number of citizens, the court will withhold its hands.''

To the same effect is State of Kansas v. Dodge City Railway Company, 53 Kan. (329), 24 L. R. A. 564.

In Jack v. Williams, 113 Fed. 823, the court had before it the question whether the owners of a railroad could be compelled to operate it at a loss, and said: ''To be thus useful to the public, the road must be kept up in such a condition that life and property both must be made as safe as practicable. The rates of transportation of persons and freight must be reasonable. And a reasonable number of trains must be kept up, dependent upon the circumstances surrounding the railway. Whilst thus serving the public, however, no corporation or private person is obliged to continue the service without a reasonable remuneration. No one can be compelled to serve the public for nothing. Private property of no kind, including railroad property, can be used for public purposes without compensation. Smyth v. Ames, 169 U. S. 467, 18 Sup. Ct. 418, 42 L. Ed. 819; Road Co. v. Sandford, 164 U. S. 578. 17 Sup. Ct. 198, 41 L. Ed. 560; Chicago, M. & St. P. R. Co. v. Minnesota, 134 U. S. 418, 10 Sup. Ct. 462, 33 L. Ed. 970; Railway Co. v. Smith, 173 U. S. 684, 19 Sup. Ct. 565, 43 L. Ed. 858. All these cases determine

that a railroad company, in the full enjoyment and use and capacity to use its franchises, cannot be compelled to exercise its franchises without reasonable remuneration. *A fortiori* a railroad corporation, or a person owning a railroad cannot be compelled to operate that road, not only without remuneration, but at a loss. And this not by any means because such corporation or person is insolvent. If a citizen has the wealth of the Rothschilds, he cannot be compelled to use a dollar of his wealth for public purposes without compensation.''

This case was affirmed by the Circuit Court of Appeals in State of South Carolina v. Jack, 145 Fed. 281.

The case of Southern Railway Company in Kentucky v. Hatchett, 174 Ky. 463, is relied on by counsel for the county and city, but there is no conflict whatever between what was said in that case and what we have said in this one. The facts of the two cases are radically different and the principle announced in the Hatchett case has no application to the facts of this case. It should, however, be said that in the Hatchett case, although the court ruled that a solvent railroad company could not abandon a portion of its road merely because the operation of such portion was unremunerative, it yet recognized and approved the doctrine that where the whole road could not be operated except at a loss, its use might be abandoned in the absence of a contract obligation.

Having reached the conclusion that a street railway company may, in the absence of a contract obligation, abandon its whole line of road when it is plainly made to appear that it cannot be operated under efficient management except at a loss, the only remaining question is —Do the facts in the record before us show such a condition as would warrant the application of this rule?

The weight of the evidence, as we think, shows that this road cannot be operated except at a loss, but there are a good many facts and circumstances pointing to the conclusion that its unprofitable record has been caused by quarrels and dissensions in the management and generally inefficient control of its affairs, and so we are not entirely satisfied that it may not be so conducted as to be a remunerative property.

Accordingly we think that a further test of the question whether this road can be operated at a reasonable profit should be made before the company should be permitted to abandon it. And in order that this disputed

question of fact may be definitely settled and the rights of the public, the owners and the bondholders protected, we think that the property should be offered for sale as a going concern at an upset price of twenty-one thousand dollars, with an obligation upon the part of the purchaser to continue its operation, and if no purchaser can be found at this price and under these conditions then the court should put it in the hands of a receiver to be operated for a year without incurring any expense in excess of the income of the property, and if at the expiration of a year it is found that the road cannot be operated so as to yield a reasonable profit to the owners an order should be made permitting the owners or trustee for the bondholders, as the case may be, to sell the road in any manner they please, and for any price that suits them, with the right on the part of the purchaser to take up the tracks and other equipment and abandon the road, upon leaving the streets and highways occupied by the road and its equipment in as good condition as the remainder of the adjacent streets and roads. We have fixed the upset price at twenty-one thousand dollars, first, because that appears to be the price at which the owners and bondholders were willing to sell it, and second, because the fixing of this price will prevent the property from being sold as a going concern at a nominal sum, thereby causing the owners and bondholders to lose the difference between the amount at which they were willing to sell it and the sum at which the road might be sold.

Wherefore the judgment is reversed with directions to proceed in conformity with this opinion, each party to pay one-half of the costs in this court and in the lower court.